******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MARGUERITE PURNELL ET AL. *v.* INLAND
WETLANDS AND WATERCOURSES
COMMISSION OF THE TOWN
OF WASHINGTON ET AL.
(AC 44083)

Bright, C. J., and Elgo and Abrams, Js.

*Syllabus*

The plaintiffs, P and G, appealed to this court from the judgment of the
Superior Court dismissing their appeal from the decision of the Inland
Wetlands and Watercourses Commission of the Town of Washington to
grant a permit to W Co. to conduct certain regulated activities on its
property pertaining to its proposed construction of an inn. After the
expiration in 2018 of a permit the commission had granted in 2008 to
conduct regulated activities on the property, W Co. filed a new applica-
tion that was largely identical to the 2008 proposal but contained minor
changes in response to building and safety code requirements. In
response to a petition by residents, the commission, pursuant to statute
(§ 22a-42a (c) (1)) and the applicable provision (§ 10.03) of the Washing-
ton Inland Wetlands and Watercourses Regulations, conducted a public
hearing on the new application during which it heard from, inter alia,
P, experts who appeared on P's behalf, and, on behalf of W Co., S, the
civil engineer who had been involved with the drafting of plans for the
development since 2008. S told the commission that W Co. was seeking
reapproval of the expired 2008 permit and that it would be incorporating
into its application by reference plans that had been submitted to the
commission in 2008. L Co., which had been retained by the commission
to review the modifications in the new application, then submitted a
report in which it stated that the application was, for the most part,
identical to the previously approved application and that its modifica-
tions would not result in impacts to wetlands or watercourses. During
the public hearing, P objected to the submission of L Co.'s report and
the revised plans W Co. had submitted in response to that report. P
claimed that she lacked sufficient notice as to the report and stated
that she was unable to question L Co., which did not have a representative
at the hearing. The commission then continued the hearing, after which
a representative of L Co., who was not a civil engineer, thereafter
attended the hearing and stated that the plans before the commission
were very similar to those presented in connection with the 2008 permit
but that he was not comfortable addressing certain engineering issues.
The commission thus permitted L Co. to submit written comments, and,
after the public hearing concluded, L Co. responded in a letter to the
commission as to concerns expressed by civil engineers who had
appeared on behalf of P. L Co. stated that those concerns could be
addressed as a condition of approval of W Co.'s application and that
revisions to W Co.'s proposal would not materially change it or its
potential for wetland impacts. The commission thereafter approved W
Co.'s permit application, subject to certain conditions, and the plaintiffs,
on the granting of certification, appealed, claiming that the commission
violated their right to fundamental fairness, failed to consider alterna-
tives to W Co.'s proposal and that the commission's decision to approve
the permit application was not supported by substantial evidence. *Held*:
1. The commission's posthearing receipt and consideration of L Co.'s letter
that referenced certain data and the conditioning of the commission's
approval of W Co.'s application on W Co.'s submission of additional
material did not violate the plaintiffs' right to fundamental fairness:
   a. The plaintiffs' claim that they were deprived of the opportunity to
respond to L Co.'s letter was unavailing: W Co.'s deep test pit data, the
only piece of information in the letter that the plaintiffs claimed was
not presented at the public hearing, was not new to the commission or
the plaintiffs, as it was undisputed that the data was discussed during
the public hearing and had been furnished to the commission in connec-
tion with the 2008 application; moreover, the commission chairman
stated during the public hearing that the prior approvals and record

of the 2008 permit would be incorporated into the record of the new application, and the record demonstrated that P was well acquainted with the data, having submitted into evidence at the public hearing a report that included the data.

b. The commission properly imposed conditions that required W Co. to take specific actions to bring the proposed development plan into compliance with applicable legal and regulatory requirements; contrary to the plaintiffs' claim that the conditions, which were based on recommendations from L Co., in response to comments from P's experts, would not be subjected to the scrutiny of a public hearing, the regulations (§§ 12.09 (a) and 15.05) permitted the commission to conduct a public hearing in response to the submission of the additional material or to suspend, revoke or modify W Co.'s permit if the additional information proved to be inaccurate.

2. Contrary to the plaintiffs' assertion that the commission improperly failed to conduct a de novo review of every aspect of W Co.'s permit application, the commission properly applied the "impotent to reverse rule" and confined its de novo review to the new aspects of W Co.'s proposal; the record demonstrated that the commissioners understood that the impotent to reverse rule precluded them from reversing prior decisions pertaining to the 2008 permit approval unless there had been a change of conditions or other considerations had intervened that materially affected the merits of the matter that had been decided, and the commission implicitly found, and the evidence substantiated, that no material changes affecting those determinations had occurred, as W Co.'s application was largely identical to what had been proposed in the 2008 permit.

3. The plaintiffs could not prevail on their claim that the Superior Court improperly concluded that substantial evidence supported the commission's decision to approve W Co.'s permit application; despite the plaintiffs' contention that the application lacked certain information pertaining to, among other things, the septic system, removal of materials, and stormwater management, the record supported the commission's determination that the application satisfied the strictures of § 8 of the regulations, as S stated at the public hearing that no change to the existing septic system design was proposed, the record included details as to that design, which P appended to her written submission to the commission, W Co.'s site plan depicted specifics regarding materials to be removed, stockpiled or deposited on the property, and W Co. submitted a stormwater management report that L Co. and experts on behalf of P had reviewed.

4. Contrary to the plaintiffs' contention that the Superior Court improperly upheld the approval of W Co.'s permit application in the absence of a finding by the commission of feasible and prudent alternatives, neither of the statutes (§ 22a-41 (b) (1) or § 22a-39 (k)) that required a finding of a feasible and prudent alternative was applicable: the commission, pursuant to § 22a-41 (b) (1), did not make the threshold determination that W Co.'s proposed activity could have a significant impact on wetlands or watercourses, and § 22a-39 (k), which is applicable to a municipality that does not regulate its wetlands and watercourses and authorizes the Commissioner of Energy and Environmental Protection to conduct a public hearing in that municipality, was inapplicable because Washington had enacted inland wetlands and watercourses regulations and designated the commission as the agency charged with regulating those activities; moreover, the plaintiffs' contention that the commission failed to consider feasible and prudent alternatives to W Co.'s proposal pursuant to the applicable statutes (§§ 22a-19 (b) and 22a-41 (a) (2)) was unavailing, as P and her expert provided documentary and testimonial evidence regarding feasible and prudent alternatives during the public hearing, W Co. stated in its permit application that it had considered alternatives, and the record was replete with discussion of prior wetlands applications regarding the proposed development, including nine modifications to the 2008 permit, which constituted consideration by the commission of feasible and prudent alternatives.

Argued March 8, 2021—officially released January 11, 2022

*Procedural History*

Appeal from the decision of the named defendant granting the application of the defendant 101 Wykeham Road, LLC, for a permit to conduct certain regulated

activities on its property, and for other relief, brought to the Superior Court in the judicial district of Litchfield, where the action was withdrawn as to the defendant Commissioner of Energy and Environmental Protection; thereafter, the case was transferred to the judicial district of Waterbury, Complex Litigation Docket, and tried to the court, *Bellis, J.*; judgment dismissing the appeal, from which the plaintiffs, on the granting of certification, appealed to this court. *Affirmed.*

*Gail E. McTaggart*, for the appellants (plaintiffs).

*Kari L. Olson*, for the appellee (named defendant).

*David F. Sherwood*, for the appellee (defendant 101 Wykeham Road, LLC).

*Opinion*

ELGO, J. The plaintiffs, Marguerite Purnell and Matilda Giampietro,[1] appeal from the judgment of the Superior Court dismissing their appeal from the decision of the defendant Inland Wetlands and Watercourses Commission of the Town of Washington (commission)[2] to grant the application of the defendant 101 Wykeham Road, LLC (applicant), for a permit to conduct regulated activities pursuant to the Inland Wetlands and Watercourses Act (act), General Statutes § 22a-36 et seq.[3] On appeal, the plaintiffs claim that the court improperly concluded that (1) the commission did not violate their right to fundamental fairness, (2) the commission applied a correct legal standard in reviewing the permit application, (3) the commission's decision was supported by substantial evidence, and (4) the commission was not required to make a finding that no feasible and prudent alternatives existed. We affirm the judgment of the Superior Court.[4]

Like *Parker* v. *Zoning Commission*, 209 Conn. App.    ,    A.3d    (2022), which we also release today, this appeal concerns the development of a 26.9 acre parcel of real property owned by the applicant and known as 101 Wykeham Road in Washington (property). The property historically had been used for educational purposes.[5] In 2008, an inn and related appurtenances were proposed on the property. That proposed use was approved in 2013 as the result of a settlement agreement ratified by both the Zoning Commission of the Town of Washington and the Superior Court.[6] See id.,    .

As part of that proposed development, the commission received multiple applications pertaining to regulated activities on the property.[7] At all relevant times, the property contained 2.07 acres of inland wetlands[8] and 1150 linear feet of watercourses.[9] The property also contained 9.7 acres of upland review area.[10]

In 2008, the commission granted a permit to conduct regulated activities on the property (2008 permit) in connection with a proposed "inn, spa, fitness center, restaurant, function barn, offices, guest services and lobby, a pool house, tennis court, and . . . guest cottages." That permit was subject to eight conditions.[11] The 2008 permit was modified numerous times during the following nine years. The commission approved modifications on December 8, 2010, October 27, 2011, and on February 8 and September 26, 2012.[12] On December 10, 2014, and on May 13 and July 8, 2015, the town's inland wetlands enforcement officer[13] approved modifications that, inter alia, reduced the impervious surface area of the proposed development and, at the behest of the municipal fire marshal, reduced the total number of parking spaces. On February 8, 2017, the commission approved a modification to allow the removal of an

existing building on the property that had sustained fire damage. On June 14, 2017, the commission approved a further modification "to allow a revision to the regrading of the [m]ain [b]uilding outside of the regulated area and the addition of a retaining wall on the east side of the building and minor revision to the wall adjacent to it." In each instance, the commission or the inland wetlands enforcement officer, as part of that review, necessarily concluded that no adverse impact to wetlands or watercourses would result from the proposed activities.

It is undisputed that the 2008 permit expired in November, 2017. On February 14, 2018, the applicant filed a new permit application with the commission that contained a largely identical proposal to develop an "inn with appurtenances" on the property. The application incorporated by reference plans that previously had been submitted to the commission in connection with the 2008 permit.[14] The application also indicated that a total of 0.004 acres of wetlands would be disturbed and that no watercourses would be affected by the proposed activities.

The application was accompanied by a letter from Paul S. Szymanski, a civil engineer who had been involved in drafting site development plans for the proposed development since 2008.[15] In that letter, Szymanski stated that the applicant was seeking "reapproval" of the expired 2008 permit, as the proposal consisted of only "a few minor changes to the site development due to the [b]uilding [c]ode review . . . ." Szymanski also emphasized that the applicant was seeking approval "based on the previously permitted project that has been thoroughly vetted." In addition, Szymanski's letter included an overview in narrative form of the 2008 permit, including the approved modifications from 2010 to 2017.

At its February 14, 2018 regular meeting, the commission reviewed the application with Szymanski, who appeared on behalf of the applicant. Szymanski explained to commission members that, although "this is a new application," there were only a few "minor changes" to the proposed activities "since [the applicant was] last before you [in 2017] for revisions" to the 2008 permit, which all were in response to building code and safety requirements.[16] Szymanski also informed the commission that the applicant would be incorporating plans previously filed in connection with the 2008 permit, including the construction sequence sheets and the sedimentation and erosion control plan. The commission subsequently conducted a site inspection of the property with Szymanski.[17]

On February 27, 2018, the commission received a petition signed by sixty-two residents of Washington, including Giampietro, requesting a public hearing on the applicant's new application pursuant to General

Statutes § 22a-42a (c) (1) and § 10.03 of the Washington Inland Wetlands and Watercourses Regulations (regulations). On April 2, 2018, Purnell, a resident of Cornwall Bridge, filed a verified notice of intervention with the commission pursuant to General Statutes § 22a-19 (a). It is undisputed that Purnell had been involved in the 2008 permit proceedings for the better part of a decade.[18]

In response to the residents' petition,[19] the commission held a lengthy public hearing on the new application over the course of five nights that began on April 3, 2018, and concluded on July 11, 2018. The bulk of that hearing consisted of testimony from Purnell and Szymanski. The commission also heard from three experts retained by Purnell[20] and a third-party expert, Christopher P. Allan of Land-Tech Consultants, Inc. (Land-Tech),[21] retained by the commission.

At the outset of the first night of the public hearing, commission Chairman Stephen Wadelton explained that the so-called impotent to reverse rule; see, e.g., *Bradley* v. *Inland Wetlands Agency*, 28 Conn. App. 48, 50, 609 A.2d 1043 (1992); precluded the commission from revisiting its prior determinations made as part of the 2008 permit process "unless there has been significant change to what was previously approved." In light of the commission's extensive review, and ultimate approval, of the 2008 permit, Wadelton asked all in attendance to "limit your comments to . . . what [has] changed significantly from what was approved [as part of the 2008 permit]." After receiving testimony and documentary evidence over the course of two nights from Szymanski, Purnell, her experts from Towne Engineering, Inc., and other interested parties, the commission voted to retain Land-Tech "to review all of the changes" contained in the new application.

Land-Tech thereafter submitted a written report (Land-Tech report), in which it noted that it "has been involved in the review of several inland wetland permit applications for the [c]ommission pertaining to the proposed development of the subject property. These [third-party] reviews included numerous site inspections, detailed reviews of application documents, review of intervenor/public comments and reports, responses to [c]ommission comments and questions, and participation in several public hearings" beginning in 2008. The report then stated that the new application "is for the most part identical to the previously approved application with some minor revisions." After detailing the specific nature of those revisions,[22] the report concluded that "these plan modifications are minor in scope and will not result in any impacts to wetlands or watercourses." The report also included a response to comments from Towne Engineering, Inc., and a handful of recommendations for the commission.

The Land-Tech report was reviewed by the commis-

sion at the public meeting on June 20, 2018.[23] At that time, Szymanski provided an overview of a revised set of plans that the applicant recently had submitted in response to comments contained in the Land-Tech report.[24] Szymanski also submitted a revised stormwater management report to the commission.

Purnell then addressed the commission and objected to the submission of the Land-Tech report and the applicant's revised plans. Although she conceded that copies of those materials had been furnished to her and her experts a day earlier, she claimed that such notice was insufficient. Purnell also opined that "Land-Tech should be here so that I may [question] them directly." Purnell then turned her attention to changes to the structures proposed for the property, opining that "the members of the [commission are] unfamiliar with many details regarding the size and intensity of the current proposal . . . ." In response, Wadelton noted that "these are all considerations for [the] zoning commission, right?" When Purnell continued discussing the size and floor area of the proposed structures, Wadelton stated: "I'm sorry, yes, this is a public hearing on wetlands concerns, and, so far, I'm not hearing any. . . . I'm not going to waste any more of this commission's time listening to zoning issues because we have no control over that." Purnell then submitted her written comments to the commission, in which she alleged that "[t]he [s]ize of the [p]roposed [f]acility is [s]ignificantly [l]arger" and that "[t]he [u]se of the [f]acility has [i]ntensified."

Joseph H. Boucher and Matthew D. Maynard, the plaintiff's experts from Towne Engineering, Inc., provided a letter to the commission that night, which concerned certain "items [that] still have not been addressed or properly documented" by the applicant. They also offered testimony related thereto. In light of the recent submission of the Land-Tech report and the applicant's revised plans, Boucher respectfully suggested that the commission should not close the public hearing that night. Wadelton agreed, stating that "we should have . . . a representative from Land-Tech here." The commission thus continued the public hearing until July 11, 2018.

On July 5, 2018, the applicant submitted additional revisions to the commission, including an updated storm drainage study. That submission was accompanied by a letter from a colleague of Szymanski, Jeremy R. Oskandy, a senior project manager, summarizing those "[s]upplemental [r]evisions" to the plan.[25] Szymanski provided copies of those revisions to Purnell on July 6, 2018.

At the fifth and final night of the public hearing on July 11, 2018, experts from Towne Engineering, Inc., and Trinkaus Engineering, LLC, appeared on behalf of Purnell and opined that the activities proposed by the applicant would have an adverse impact on wetlands

and watercourses on the property. Their comments also were memorialized in two letters that the commission received on the eve of that hearing.

Allan appeared at the hearing on behalf of Land-Tech and noted that the plans currently before the commission were "very similar" to the ones presented as part of the 2008 permit. Allan informed the commission that Land-Tech was satisfied with the applicant's responses to the comments contained in its report and that Land-Tech did not have any additional concerns. At the same time, Allan indicated that he was not comfortable "addressing some of the engineering issues" that had been raised, as he was not a professional engineer. See footnote 21 of this opinion. He thus offered to have Land-Tech submit comments to the commission "on some of [the experts'] letters" after the public hearing concluded, to which Wadelton responded, "[t]he commission would definitely appreciate that."[26] After hearing further testimony from Purnell, Szymanski, and other members of the public, the commission closed the public hearing.

Two weeks later, Land-Tech submitted its written response to the commission (Land-Tech letter). That letter began by noting that the commission had asked Land-Tech "to review and comment on two letters received by the [c]ommission" from Towne Engineering, Inc., and Trinkaus Engineering, LLC. Land-Tech disagreed that the activities proposed by the applicant would have an adverse impact on wetlands and watercourses on the property and opined that "the applicant has made significant efforts in the design to mitigate any potential impacts." Land-Tech further stated that certain "comments contained in the Towne Engineering letter regarding plan inconsistencies, errors or conflicts can be addressed, where warranted, by the applicant in a final set of construction plans/reports as a condition of approval, if the application is approved. It is our opinion that these revisions/corrections will not materially change the development proposal or its potential for wetland impacts."[27] (Emphasis omitted.) In addition, Land-Tech emphasized that "[a]ny *material* changes to the [final set of] plans such as relocation of the water main, structures, driveways, septic system components, stormwater drainage system components, etc. will require [resubmission] of plans and an application to the [c]ommission." (Emphasis added.)

The commission deliberated the merits of the applicant's request for a new permit over the course of two nights on July 31 and August 14, 2018. At the conclusion of those deliberations, the commission unanimously approved the permit application, subject to ten detailed conditions.[28]

On September 6, 2018, the plaintiffs commenced an appeal in the Superior Court challenging the propriety

of the commission's decision to grant the permit application.[29] They claimed, inter alia, that the commission violated their right to fundamental fairness, that it failed to consider feasible and prudent alternatives, and that its decision was not supported by substantial evidence. The court rejected those claims and dismissed the appeal. The plaintiffs then filed a petition with this court for certification to appeal pursuant to General Statutes §§ 8-8 (o) and 22a-43 (e). We granted the plaintiffs' petition and this appeal followed.

As a preliminary matter, we note that the act provides in relevant part that "no regulated activity shall be conducted upon any inland wetland or watercourse without a permit. Any person proposing to conduct or cause to be conducted a regulated activity upon an inland wetland or watercourse shall file an application with the inland wetlands agency of the town or towns wherein the wetland or watercourse in question is located. . . ." General Statutes § 22a-42a (c) (1).

Municipal inland wetlands agencies in this state are "authorized to establish the boundaries of inland wetlands and watercourse areas within [their] jurisdiction. Once such boundaries are established . . . no regulated activity shall be conducted within such boundaries without a permit issued by the local agency. . . . [L]ocal inland wetland bodies are not little environmental protection agencies. Their environmental authority is limited to the wetland and watercourse area that is subject to their jurisdiction. They have no authority to regulate any activity that is situated outside their jurisdictional limits. Although in considering an application for a permit to engage in any regulated activity a local inland wetland agency must . . . take into account the environmental impact of the proposed project, it is the impact on the regulated area that is pertinent, not the environmental impact in general. . . . Thus, an inland wetland agency is limited to considering only environmental matters which impact on inland wetlands." *Connecticut Fund for the Environment, Inc.* v. *Stamford*, 192 Conn. 247, 250, 470 A.2d 1214 (1984).

As our Supreme Court has observed, "[t]he sine qua non of review of inland wetlands applications is a determination [of] whether the proposed activity will cause an *adverse impact* to a wetland or watercourse." (Emphasis in original.) *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, 269 Conn. 57, 74, 848 A.2d 395 (2004). "Evidence of general environmental impacts, mere speculation, or general concerns" do not suffice. Id., 71. Rather, "[a]bsent evidence that identifies and specifies the actual harm resulting therefrom, a commission cannot find that the proposed activities will, or are likely to, adversely impact wetlands or watercourses." *Three Levels Corp.* v. *Conservation Commission*, 148 Conn. App. 91, 112, 89 A.3d 3 (2014); see also *River Bend Associates, Inc.* v.

*Conservation & Inland Wetlands Commission*, supra, 77–81 (proof of specific, actual harm required); *Cornacchia* v. *Environmental Protection Commission*, 109 Conn. App. 346, 359, 951 A.2d 704 (2008) ("[t]he impact on the wetlands and watercourses must be adverse and must be likely").

In granting the applicant's request for a new permit to conduct regulated activities on the property, the commission in the present case did not provide a collective statement of the basis of its decision, as required by § 22a-42a (d) (1).[30] Notwithstanding that statutory imperative, our Supreme Court has held that "it is improper for [a] reviewing court to reverse an [inland wetlands] agency decision simply because an agency failed to state its reason for its decision on the record. The reviewing court instead must search the record of the hearings before that commission to determine if there is an adequate basis for its decision. . . . [P]ublic policy reasons make it practical and fair to have a [reviewing] court on appeal search the record of a local land use body . . . composed of laymen whose procedural expertise may not always comply with the multitudinous statutory mandates under which they operate." (Citations omitted; internal quotation marks omitted.) *Samperi* v. *Inland Wetlands Agency*, 226 Conn. 579, 588–89, 628 A.2d 1286 (1993). Accordingly, this court is obligated to search the record to determine whether a proper basis for the commission's decision exists.

I

The plaintiffs claim that the court improperly concluded that the commission did not violate their right to fundamental fairness. More specifically, they contend that the commission improperly considered the Land-Tech letter that was submitted after the close of the public hearing and improperly conditioned its approval on the submission of additional material by the applicant. We do not agree.

As our Supreme Court has explained, the procedural right involved in administrative proceedings properly is described as the right to fundamental fairness, as distinguished from the due process rights that arise in judicial proceedings. *Grimes* v. *Conservation Commission*, 243 Conn. 266, 273 n.11, 703 A.2d 101 (1997). "While proceedings before [land use agencies] are informal and are conducted without regard to the strict rules of evidence . . . they cannot be so conducted as to violate the fundamental rules of natural justice. . . . Fundamentals of natural justice require that there must be due notice of the hearing, and at the hearing no one may be deprived of the right to produce relevant evidence or to cross-examine witnesses produced by his adversary . . . . [T]he parties involved [must] have an opportunity to know the facts on which the commission is asked to act . . . and to offer rebuttal evidence. . . . In short, [t]he conduct of the hearing must be

fundamentally fair." (Citations omitted; internal quotation marks omitted.) *Megin* v. *Zoning Board of Appeals*, 106 Conn. App. 602, 608–609, 942 A.2d 511, cert. denied, 289 Conn. 901, 957 A.2d 871 (2008). Whether the right to fundamental fairness has been violated in an administrative proceeding is a question of law over which our review is plenary. Id., 608.

A

On appeal, the plaintiffs maintain that the commission's consideration of the Land-Tech letter was improper. Because that letter was submitted to the commission weeks after the public hearing had concluded, the plaintiffs claim that they were deprived of the opportunity to respond to its contents in violation of their right to fundamental fairness.

It is well established that municipal land use agencies "are entitled to technical and professional assistance in matters which are beyond their expertise . . . [and] such assistance may be rendered in executive session. . . . The use of such assistance, however, cannot be extended to the receipt, ex parte, of information supplied by a party to the controversy without affording his opposition an opportunity to know of the information and to offer evidence in explanation or rebuttal." (Citations omitted.) *Pizzola* v. *Planning & Zoning Commission*, 167 Conn. 202, 208, 355 A.2d 21 (1974). That precept applies equally to information provided by a commission's own experts. As this court has noted, numerous cases "have approved the consideration of information by a local administrative agency supplied to it by its own technical or professional experts outside the confines of the administrative hearing." *Norooz* v. *Inland Wetlands Agency*, 26 Conn. App. 564, 570, 602 A.2d 613 (1992). At the same time, "the common thread [in those cases] is that it is unfair for [any entity] to submit *additional evidence* to the [agency] without giving the other party an opportunity to respond to this additional evidence." (Emphasis in original; internal quotation marks omitted.) Id., 573. Accordingly, "[t]he proper inquiry for a reviewing court, when confronted with an administrative agency's reliance on nonrecord information provided by its technical or professional experts, is a determination of whether the challenged material includes or is based on any fact or evidence that was not previously presented at the public hearing in the matter." Id., 573–74.

On the final night of the public hearing in the present case, Allan responded on behalf of Land-Tech to various concerns raised about the pending application. He nevertheless was hesitant to address "some of the engineering issues" that had been raised in letters from Purnell's experts, as he was not a professional engineer. For that reason, Allan agreed to have Land-Tech submit written comments to the commission on those issues after the public hearing concluded. When Purnell voiced

her concern about not being able to respond to Land-Tech's forthcoming comments, Wadelton informed her that Land-Tech "is merely going to respond to information that your experts provided."

In its subsequent letter, Land-Tech did exactly that. That letter began by noting that the commission had asked Land-Tech "to review and comment on two letters received by the [c]ommission at the July 12, 2018 public hearing." The letter then responded point by point to the concerns enumerated in written correspondence that the commission had received from Towne Engineering, Inc., and Trinkaus Engineering, LLC. Although Land-Tech disagreed with the majority of the concerns and conclusions set forth by those experts, it agreed that the development plan before the commission contained some minor discrepancies and errors. See footnote 27 of this opinion. Land-Tech further opined that certain "comments contained in the Towne Engineering letter regarding plan inconsistencies, errors or conflicts can be addressed, where warranted, by the applicant in a final set of construction plans/reports as a condition of approval, if the application is approved. It is our opinion that these revisions/corrections will not materially change the development proposal or its potential for wetland impacts." In addition, Land-Tech emphasized that "[a]ny *material* changes to the [final set of] plans, such as relocation of the water main, structures, driveways, septic system components, stormwater drainage system components, etc. will require re-submission of plans and an application to the [c]ommission." (Emphasis added.)

On appeal, the plaintiffs have identified only one piece of information referenced in the Land-Tech letter that allegedly was not presented at the public hearing—what they term the "deep test pit data critical for review of the large wet ponds and rain gardens" proposed by the applicant.[31] That information was not new to the commission or the plaintiffs. It is undisputed that the applicant furnished the deep test pit data referenced in the Land-Tech letter to the commission in 2010 in connection with the 2008 permit process, as reflected in Land-Tech's October 5, 2011 correspondence with the commission, which is contained in the record before us. Moreover, Szymanski, in an April 6, 2018 letter to the commission regarding that test pit information, quoted directly from that October 5, 2011 correspondence in detailing the nature of those test pits, which information he also recited at the fourth night of the public hearing.[32]

In this regard, it bears emphasis that, on the first night of the public hearing on the new application in 2018, Szymanski explained that the applicant was requesting "that the prior approvals and record [of the 2008 permit] be incorporated" into the record of the new application. Purnell then opined that, because "[t]his is a new application," the commission should "insist that

all the material in support of the application [is] included in the file . . . ." In response, Szymanski reiterated that "[t]he record was requested to be incorporated that was previously approved. The . . . reason is . . . it went through an extensive amount of review by a third-party engineer that [the commission] retained on [its] behalf to protect [its] interests. So . . . to not incorporate that would be to ignore the years of work that this commission and the applicant and those who are opposed or in favor of the application did to arrive at the conclusions that were arrived at. To . . . somehow state that all of that should be ignored, just from a commonsense perspective, doesn't make sense. . . . [T]he prior approval was based on that record. It . . . should be incorporated because that's the basis for what we're requesting [for] these minor little tweaks to the [development plan]. I mean . . . [the plan] hasn't changed. The drainage calculations are the same as they were. There's no change. So whether it's taken from one box and put into another box or there's a fresh print it's the same thing."

Purnell then asked, "[a]re we going to incorporate everything all the way back to 2008? Is that what we're talking about?" At that time, the commission's legal counsel interjected: "I appreciate where you're coming from, but there's also a very significant principle under the law that a commission cannot overrule itself absent some significant change in circumstances. They can't turn around . . . one commission can't turn around five years later [and] overturn themselves. And again, that's . . . it's a principle, it's established Supreme Court precedent. There has to be some kind of significant change in circumstances that justifies a commission changing their mind on something they had previously approved. And the reason for that is so that any applicant can rely . . . on their permit or their approval . . . and that it won't be subject to . . . the changing winds of commission members who come and go. . . . There needs to be finality in decision and that's why . . . you have the right to appeal . . . at the time that those decisions are made." When Purnell replied, "I completely understand that," counsel again noted that the applicant had "incorporated [the] documents [from the 2008 permit] into this record."

Moreover, on the second night of the hearing, Wadelton clarified that, at the request of the applicant, "all the previous submissions" would be included in the record. When Purnell asked if that included "all the boxes" of material from the 2008 permit, Wadelton stated: "You've been going through these files since day one," to which Purnell replied, "Yeah, I follow." Wadelton then noted, "I believe you've seen everything that's there." Purnell's knowledge of the record of the 2008 permit proceedings again was discussed during the fourth night of the public hearing, when Wadelton reminded her that there had been a "big discussion"

earlier in the hearing as to whether the commission was "going to include everything from all the previous applications." The following colloquy then ensued:

"[Wadelton]: I've been going over that data for eight years now. I'm very familiar [with] what's in [the record of the 2008 permit], and . . . so are you.

"[Purnell]: . . . I know.

"[Wadelton]: Okay. You know everything that's in there . . . ."

More importantly, the record before us demonstrates that Purnell was well acquainted with the deep test pit data in question. In her remarks on the first night of the public hearing, Purnell specifically referenced those test pits and demonstrated a degree of familiarity therewith, stating, in relevant part: "[There are] two deep test pits . . . that have . . . been done on this property. One is in Wet Pond 1 and one is in Wet Pond 2. . . . [T]hey do not bear the typical signature of the soils that you find in those particular areas or that you would expect to find based on the [National Resources Conservation Service] data."[33] In addition, Purnell submitted a report into evidence at the public hearing that included "[d]eep test pit data" on the property.

The record thus demonstrates that the deep test pit data in question was part of the record of the 2008 permit, which the applicant incorporated by reference into the present proceeding, and it was discussed in detail by Purnell and Szymanski at the public hearing. We therefore conclude that, on the particular facts of this case, the commission's posthearing receipt of the Land-Tech letter referencing that information did not violate the plaintiffs' right to fundamental fairness.

B

The plaintiffs also claim that the commission improperly conditioned its approval on the submission of additional material by the applicant. They contend that the final three conditions imposed by the commission, which required the applicant to submit revised calculations regarding certain stormwater discharge rates, revised outlet control details, and a "final plan set," violate their right to fundamental fairness.[34] We do not agree.

As our Supreme Court has noted, the appellate courts of this state "previously have held that conditional approvals of wetland permit applications are permissible." *Finley* v. *Inland Wetlands Commission*, 289 Conn. 12, 42, 959 A.2d 569 (2008); see also General Statutes § 22a-42a (d) (1) (inland wetlands agency may impose conditions on permit to conduct regulated activity); *Bochanis* v. *Sweeney*, 148 Conn. App. 616, 620 n.7, 86 A.3d 486 (inland wetlands agency "had the authority to grant the permit only upon the [applicants'] fulfillment of certain conditions"), cert. denied, 311 Conn. 949, 90

A.3d 978 (2014).

The conditions imposed by the commission in the present case were based on recommendations from its consultants at Land-Tech in response to comments from Purnell's experts at Towne Engineering, Inc. The conditions required the applicant to make certain revisions to its development plan. Furthermore, Land-Tech advised the commission that "these revisions/corrections will not materially change the development proposal or its potential for wetland impacts."

The present case thus resembles *Gardiner* v. *Conservation Commission*, 222 Conn. 98, 106, 608 A.2d 672 (1992), in which a land use commission attached conditions to its permit approval that required the applicant to submit additional calculations in response to a request for that information. As in the present case, the plaintiff in *Gardiner* who challenged the propriety of the commission's decision did not allege that "any of the conditions were unreasonable" but, nevertheless, maintained that, "because they require the submission of information that will not be subjected to the scrutiny of a public hearing, his . . . right to a fair hearing [was] violated." Id. Our Supreme Court rejected that contention, stating: "To adopt [the plaintiff's] view would inhibit an inland wetlands agency in imposing such conditions as it deemed necessary to safeguard against the risk of pollution in the light of concerns raised during its deliberations. We conclude that [the plaintiff's] rights were not violated merely by the attachment to a permit of conditions that required the submission of further information after the agency's decision had been rendered." Id.; see also *Finley* v. *Inland Wetlands Commission*, supra, 289 Conn. 52–53 (*Norcott, J.*, concurring) ("the commission had the general authority pursuant to § 22a-42a (d) (1) to facilitate the progress of applications that otherwise would fail to comply with the comprehensive environmental regulatory scheme by conditioning their approval on the implementation of measures to cure those deficiencies"). That same logic applies here.

Moreover, the court in *Gardiner* emphasized that the plaintiff was not without recourse in the event that the information submitted by the applicant in response to the conditions of approval raised additional concerns. As it explained: "At this time . . . there has been no violation of [the plaintiff's] right to a fair hearing. We do not know precisely what information will be submitted or what its significance will be with respect to the need for modifications of [the applicant's] proposal. The commission may well provide an opportunity for [the plaintiff] or other interested persons to challenge the information when it is furnished. . . . [A]dministrative boards [should] allow such an opportunity when information pertinent to an application is requested . . . . It is conceivable that an additional public hearing

may be held if the information requested should raise serious concerns among the commission members about the likelihood of pollution." (Citations omitted.) *Gardiner* v. *Conservation Commission*, supra, 222 Conn. 104. Furthermore, because the wetlands regulations in that case authorized the commission to revoke a permit if "an activity for which it has granted a permit, or granted a permit with conditions, has had a more severe impact or effect on the inland wetland or watercourse than was projected by the applicant"; (footnote omitted; internal quotation marks omitted.) id.; the court emphasized that the plaintiff would "have an opportunity to review [the applicant's] submission and to inform the commission of any inadequacies that he may discover or any additional concerns raised by the information received." Id., 105.

The regulations in the present case contain two similar provisions. Section 12.09 (a) of the regulations recognizes that the commission "has relied in whole or in part on information provided by the applicant" and then provides that, "if such information subsequently proves to be false, deceptive, incomplete, or inaccurate, the permit may be modified, suspended, or revoked." Section 15.05 similarly authorizes the commission to "suspend or revoke a permit if it finds that the permittee has not complied with the terms, conditions, or limitations set forth in the permit or has exceeded the scope of the work as set forth in the application including application plans. . . . The [commission] shall hold a hearing to provide the [applicant] an opportunity to show that it is in compliance with its permit and any and all requirements for retention of the permit." Washington Inland Wetlands and Watercourses Regs., § 15.05. Accordingly, the commission very well may conduct a hearing in response to the applicant's submission of the additional material required by the final three conditions of approval. We note in this regard that, in its posthearing letter, Land-Tech repeatedly advised the commission that "[a]ny material changes" to the applicant's proposal contained therein would require the "[resubmission] of plans and an application [for a modification] to the commission."

The three conditions at issue were imposed by the commission in response to feedback it received from both Land-Tech and Purnell's experts. Moreover, those conditions obligated the applicant to take specific actions to bring the proposed development plan into compliance with applicable legal and regulatory requirements. See *Finley* v. *Inland Wetlands Commission*, supra, 289 Conn. 42. We therefore conclude that the imposition of those conditions did not violate the plaintiffs' right to fundamental fairness.

II

The plaintiffs also argue that the court improperly concluded that the commission applied a correct legal

standard in reviewing the permit application in 2018. That claim presents a question of law over which our review is plenary. See, e.g., *Hartford Courant Co.* v. *Freedom of Information Commission*, 261 Conn. 86, 96–97, 801 A.2d 759 (2002).

The plaintiffs' claim is predicated on their contention that the commission, in adhering to the impotent to reverse rule, improperly failed to conduct a de novo review of every aspect of the application in question. They misunderstand the nature of that rule.

The impotent to reverse rule has governed the conduct of municipal administrative agencies in this state for more than ninety years. See, e.g., *Grillo* v. *Zoning Board of Appeals*, 206 Conn. 362, 367, 537 A.2d 1030 (1988); *Mynyk* v. *Board of Zoning Appeals*, 151 Conn. 34, 37, 193 A.2d 519 (1963); *Hoffman* v. *Kelly*, 138 Conn. 614, 616–17, 88 A.2d 382 (1952); *St. Patrick's Church Corp.* v. *Daniels*, 113 Conn. 132, 137, 154 A. 343 (1931). As our Supreme Court has explained, "[f]rom the inception of [land use regulation] to the present time, we have uniformly held that a [municipal land use agency] should not ordinarily be permitted to review its own decisions and revoke action once duly taken. . . . Otherwise . . . there would be no finality to the proceeding and the decision would be subject to change at the whim of the board or through influence exerted on its members." (Citations omitted.) *Mitchell Land Co.* v. *Planning & Zoning Board of Appeals*, 140 Conn. 527, 533, 102 A.2d 316 (1953).

At the same time, the court has recognized that, although "[f]inality of decision is . . . desirable" in the administrative context; id., 534; that principle "is by no means inflexible." *Middlesex Theatre, Inc.* v. *Hickey*, 128 Conn. 20, 22, 20 A.2d 412 (1941). The impotent to reverse rule thus embodies an important limitation on the ability of an administrative agency to reconsider its prior determinations, while at the same time affording a degree of flexibility in limited circumstances. The rule dictates that "an administrative agency cannot reverse a prior decision unless there has been a change of conditions or other considerations have intervened which materially affect the merits of the matter decided." *Malmstrom* v. *Zoning Board of Appeals*, 152 Conn. 385, 390–91, 207 A.2d 375 (1965). Mere change in conditions or other factors is not enough; only proof of material change permits an agency to reconsider its prior determination. See, e.g., *Sipperley* v. *Board of Appeals on Zoning*, 140 Conn. 164, 168, 98 A.2d 907 (1953), overruled in part on other grounds by *Fiorilla* v. *Zoning Board of Appeals*, 144 Conn. 275, 279, 129 A.2d 619 (1957); *Rommell* v. *Walsh*, 127 Conn. 272, 277, 16 A.2d 483 (1940); *Burr* v. *Rago*, 120 Conn. 287, 292–93, 180 A. 444 (1935). Moreover, the impotent to reverse rule "applies . . . only when the subsequent application seeks substantially the same relief as that sought

in the former. And it is for the administrative agency, in the first instance, to decide whether the requested relief in both applications is substantially the same." *Fiorilla* v. *Zoning Board of Appeals*, 144 Conn. 275, 279, 129 A.2d 619 (1957).

The application at issue in this appeal was filed against the backdrop of the 2008 permit, as most recently modified on June 14, 2017. The application materials expressly indicated that the applicant was seeking "reapproval" of the expired 2008 permit, as the proposal consisted of only "a few minor changes" to the development plan to ensure building code compliance. The application expressly incorporated by reference plans that previously had been submitted to the commission in connection with the 2008 permit and further noted that the application was "based on the previously permitted project that has been thoroughly vetted." Given the overwhelming similarity between that application and the 2008 permit, which both sought permission to conduct regulated activities on the property as part of a plan to develop an inn and related appurtenances, we conclude that the commission was well within its discretion to determine that the relief requested in both applications was substantially the same.

The critical question, then, is whether "there has been a change of conditions or other considerations have intervened which materially affect the merits of the matter decided." *Malmstrom* v. *Zoning Board of Appeals*, supra, 152 Conn. 390–91. At the outset of the public hearing conducted in response to the petition from Washington residents, Wadelton explained that, in the absence of proof of material change, the impotent to reverse rule precluded reconsideration of prior determinations made by the commission as part of the 2018 permit. Because the commission already had approved the 2008 permit and numerous modifications, he stated that the commission could not revisit its prior determinations "unless there has been a significant change to what was previously approved." For that reason, Wadelton asked all in attendance to "limit your comments to . . . what [has] changed significantly from what was approved [as part of the 2008 permit]."

When Purnell later opined at the second night of the hearing that this was a new application that required de novo review of every aspect of the applicant's proposal, Wadelton disagreed, noting that, "for us to go back and reverse decisions, many, several decisions [made as part of the 2008 permit], we need to see [evidence of] significant change . . . ." The commission subsequently received a letter from Washington resident Howard J. Barnet dated May 30, 2018. Although he conceded that he was "not an expert in land use law," Barnet opined that the commission was "applying the wrong legal standard to evaluate the current applica-

tion" and stated that "[t]his application must be considered on a *de novo* basis." (Emphasis in original.)

In response, the commission sought the advice of its land use counsel, Attorney Kari L. Olson. In her June 18, 2018 memorandum to the commission, Olson disagreed with Purnell and Barnet's contention that the commission was not only permitted but required to conduct a de novo review of every aspect of the new application. She first provided a detailed overview of the impotent to reverse rule, quoting directly from decisions of our Supreme Court and this court. Olson then applied that established precedent to the pending matter, stating: "Thus, regardless of what you call the [a]pplication—new or renewed—this [c]ommission cannot reverse a decision already rendered unless there has been a change of condition or other considerations that materially affect the original decision have intervened and no vested rights have arisen. The linchpin to either [ground] for changing the [c]ommission's mind is the need for the [c]ommission to focus on what has changed between its approval of the lapsed permit and the new [a]pplication. Thus, it is up to the [c]ommission to determine whether the [a]pplication involves significantly different regulated activities. It also is for the [c]ommission to decide whether there has been a change of condition or other material consideration in the intervening years. To that end, the [c]ommission can require as much information and expert opinion as it deems appropriate under the [r]egulations. But at the end of the day, in the absence of a change in condition or material consideration with no vested rights, the [c]ommission cannot properly overrule its earlier determination." Olson also provided a summary of that memorandum for commission members on the fourth night of the public hearing.

During its subsequent deliberations on the application, the commission recognized that it could only revisit its prior determinations if it first concluded that a material change existed. As one unidentified commission member stated, "you can't reopen everything." The commission then proceeded to consider whether any significant changes had transpired that materially affected the merits of its earlier determinations before ultimately deciding to grant the permit application.[35]

We conclude that the commission properly applied the impotent to reverse rule in the present case. The applicant was seeking the same relief as that sought as part of the 2008 permit, and it presented an application that was largely identical to what had been proposed in the 2008 permit, as most recently modified on June 14, 2017.[36] The record demonstrates that the members of the commission understood that, with respect to any of its prior determinations that were made as part of the 2008 permit and the nine modifications thereof, they were permitted to reconsider those determinations

only upon a finding that a change of conditions or other considerations had occurred that materially affected the merits of the matter previously decided.

Furthermore, the predicate finding as to whether any material changes had transpired was, in the first instance, a question of fact for the commission to resolve. See, e.g., *Bradley* v. *Inland Wetlands Agency*, supra, 28 Conn. App. 51. Because the commission did not reverse any of its prior determinations, it implicitly found that no material changes affecting those determinations occurred. That finding is reviewed on appeal pursuant to the substantial evidence standard. See *Shanahan* v. *Dept. of Environmental Protection*, 305 Conn. 681, 700, 47 A.3d 364 (2012).

"In challenging an administrative agency action, the plaintiff has the burden of proof. . . . The plaintiff must do more than simply show that another decision maker, such as the trial court, might have reached a different conclusion. Rather than asking the reviewing court to retry the case de novo . . . the plaintiff must establish that substantial evidence does not exist in the record as a whole to support the agency's decision. . . . In reviewing an inland wetlands agency decision made pursuant to the act, the reviewing court must sustain the agency's determination if an examination of the record discloses evidence that supports any one of the reasons given. . . . The evidence, however, to support any such reason must be substantial; [t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency." (Internal quotation marks omitted.) *Finley* v. *Inland Wetlands Commission*, supra, 289 Conn. 37–38.

"As our Supreme Court has explained, the substantial evidence standard is a compromise between opposing theories of broad or de novo review and restricted review or complete abstention. . . . The substantial evidence standard has been described as a test that is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review. . . . Plainly, then, substantial evidence and clearly erroneous are not synonymous standards. . . . The distinction between the clearly erroneous and substantial evidence standards is not an academic one. The clearly erroneous standard of review provides that [a] court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . The substantial evidence standard is even more deferential. Under the substantial evidence standard, a reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent

an administrative agency's finding from being supported by substantial evidence . . . . Significantly, substantial evidence is something less than the weight of the evidence. . . . The substantial evidence standard imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and [provides] a more restrictive standard of review than [the] clearly erroneous [standard of review]. . . . Because that standard permits less judicial scrutiny than the clearly erroneous standard of review . . . [t]he term substantial evidence appears to be something of a misnomer." (Citations omitted; internal quotation marks omitted.) *Three Levels Corp.* v. *Conservation Commission*, supra, 148 Conn. App. 100–102.

The record before us contains evidence to substantiate a finding that no change of conditions or other considerations had intervened since the 2008 permit last was modified in July, 2017, that materially affected the merits of the commission's prior determinations. Apart from the ample documentary and testimonial evidence introduced over the course of five evenings by the applicant, the record contains two written opinions from Land-Tech, a consultant that the commission retained to evaluate the application before it. In its June 8, 2018 report, Land-Tech advised the commission that "[t]he current application . . . is for the most part identical to the previously approved [2008 permit] with some minor revisions. . . . It is our opinion that these plan modifications are minor in scope and will not result in any impacts to wetlands or watercourses." In its July 25, 2018 letter issued in response to comments from Purnell's experts, Land-Tech opined the certain "revisions/corrections [in response to those comments] will not materially change the development proposal or its potential for wetlands impacts." The commission, as the arbiter of credibility, was entitled to credit that advice. See, e.g., *Three Levels Corp.* v. *Conservation Commission*, supra, 148 Conn. App. 126; *Bradley* v. *Inland Wetlands Agency*, supra, 28 Conn. App. 53.

In its appellate briefs, the plaintiffs list a litany of changes to the plan originally proposed for the property in 2008, including the undisputed fact that a fire in 2017 destroyed what previously was the main building and that the proposed use at one point was changed from a school to an inn. Those changes nonetheless were the subject of prior, approved modifications to the 2008 permit and, thus, cannot constitute a new material change. See, e.g., *Spencer* v. *Board of Zoning Appeals*, 141 Conn. 155, 160, 104 A.2d 373 (1954) (land use agency cannot reverse its prior determination when "[t]he application and the evidence to support it . . . are not essentially different from the application and the evidence previously presented" to agency).

Moreover, as our Supreme Court has observed, "[t]he

[appellants] misconceive the import of the principle under discussion. The considerations [embodied in the impotent to reverse rule] do not refer to newly thought of grounds which could have been presented by the earlier application and are recited in a subsequent application asking for relief substantially identical [to] that previously sought. To fall within the principle, the consideration must relate to something that was not and could not have been advanced as a reason . . . upon the prior application. It must relate to some material new factor which was nonexistent when the prior application was [decided]." *Sipperley* v. *Board of Appeals on Zoning*, supra, 140 Conn. 168; see also *Burr* v. *Rago*, supra, 120 Conn. 293 (emphasizing that inquiry centers on whether " 'new conditions have arisen' " and cautioning against giving "too broad a scope to the question of material changes"). Accordingly, the commission properly could determine that any purported changes that were, or could have been, raised during the 2008 permit approval process were not germane to the present application and, thus, were subject to the impotent to reverse rule.

Furthermore, with respect to several new changes identified by the plaintiffs, such as alterations to the septic system design, the water supply plan, the stormwater management report, the catch basin size, the precipitation data, and the removal of trees along Kirby Brook, the record reveals that those issues were discussed during the public hearing, and there is no indication in the record that they were not subject to de novo review by the commission.[37] Indeed, the commission received evidence on those matters and solicited expert advice thereon from its own consultants. The commission nonetheless concluded that a review of that evidence did not demonstrate that the activities proposed by the applicants were likely to cause an adverse impact to wetlands or watercourses. Cf. *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, supra, 269 Conn. 75.

In the present case, the commission was presented with an application that was substantially identical to the one that had been subject to the commission's prior scrutiny, which resulted in the approval of the 2008 permit and its nine modifications. On our review of the record, we conclude that the commission reasonably could conclude that there had not been a change of conditions or other considerations since the 2008 permit last was modified in 2017 that materially affected the merits of the commission's prior determinations. Accordingly, the commission properly applied the impotent to reverse rule and confined its de novo review to the new aspects of the proposal submitted by the applicant.

III

The plaintiffs contend that the court improperly con-

cluded that the commission's decision was supported by substantial evidence. They claim that the applicant's submission was incomplete, as it lacked certain items required by the regulations. We disagree.

The General Statutes require applications for a permit to conduct regulated activities to be "in such form and contain such information as the [municipal] inland wetlands agency may prescribe." General Statutes § 22a-42a (c) (1). The regulations here require applications to "contain such information as is necessary for the [commission] to make a fair and informed determination as to the potential impact on wetlands and/or watercourses of any . . . regulated activity." Washington Inland Wetlands and Watercourses Regs., § 8.03. Section 8.05 of the regulations enumerates several items that "[a]ll applications shall include . . . in writing or on maps or drawings," including a "description of the land in sufficient detail to allow identification of the inland wetlands, watercourses, and upland review areas, the area(s) . . . of wetlands or watercourses to be disturbed, soil type(s), and wetland vegetation," a "site plan showing the proposed activity," and a "detailed construction sequence and construction schedule." Section 8.05 concludes with a notable proviso, which states: "Notwithstanding the foregoing provisions, the [commission] may excuse compliance with any specific requirement of this Section 8.05 if it finds that the information is not necessary to enable [the commission] to determine whether the proposed activities will cause or create the risk of detrimental impacts to wetlands or watercourses."[38]

As one treatise on land use in this state observes, "case law gives little guidance as to what is considered a complete application or a sufficient submission . . . ." R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (4th Ed. 2015) § 19:3, p. 585. That lack of guidance likely is attributable to the fact that inland wetlands agencies across Connecticut are statutorily authorized to establish their own regulatory requirements for permit applications. See General Statutes § 22a-42a (c) (1). What is clear is that the determination of whether an application is complete belongs to the land use agency in the first instance. The regulations in the present case authorize the commission to deny a permit application that it concludes is incomplete. Washington Inland Wetlands and Watercourses Regs., § 9.08; accord *Three Levels Corp.* v. *Conservation Commission*, supra, 148 Conn. App. 114 ("[a] commission is entitled to deny an application before it due to incompleteness").

The regulations also contemplate an initial review of a permit application by the commission's staff to ensure that it comports with the requirements of § 8 of the regulations. Section 9.01 provides in relevant part that "applicants are urged to submit their applications and

written requests well ahead of [commission] meetings to allow [the commission's] staff to check them for completeness and, if necessary, to allow applicants time to submit missing information." That transpired here, as the record indicates that the applicant made an initial submission to the commission in February, 2018. On February 14, 2018, Janet M. Hill, the commission's administrative assistant, sent an e-mail to Szymanski regarding the commission's "application review for completeness." Attached to that e-mail was a memorandum that noted certain omissions in the submitted application.[39] In a letter sent to Hill that same day, Szymanski responded to each of those concerns and supplemented the application accordingly. No further concerns were raised by the commission's staff or the commission itself regarding the completeness of the application.

On appeal, the plaintiffs renew their claim that the application before the commission was incomplete. A land use agency's determination on that issue is reviewed pursuant to the substantial evidence standard. See *Unistar Properties, LLC* v. *Conservation & Inland Wetlands Commission*, 293 Conn. 93, 113–14, 119–20, 977 A.2d 127 (2009). Under that standard, "the metric applied by a reviewing court is not whether the weight of the evidence supports the finding. As our Supreme Court repeatedly has explained, the substantial evidence test is something less than the weight of the evidence standard. . . . [T]he substantial evidence test permits less judicial scrutiny than the clearly erroneous standard of review. . . . Accordingly, if the record contains any evidence tending to substantiate the commission's finding in a given instance, that determination must stand under the substantial evidence test." (Citations omitted; internal quotation marks omitted.) *Three Levels Corp.* v. *Conservation Commission*, supra, 148 Conn. App. 127–28. In challenging the commission's determination, "the plaintiff carries the burden of proof to show that the challenged action is not supported by the record." *Unistar Properties, LLC* v. *Conservation & Inland Wetlands Commission*, supra, 113.

The plaintiffs claim that the application was deficient in five respects, in that it allegedly lacked (1) "septic repair and installation information," as requested in § III (2) of the application form, (2) the "amount, type and location of materials to be removed, stockpiled, or deposited," as requested in § IV (2) of the application form, (3) a statement as to "[a]lternatives considered," as requested in § IV (4) of the application form, (4) a stormwater management report, which is not required on the application form, and (5) a written report prepared by a soil scientist, which also is not required on the application form unless "a [s]oil [s]cientist is involved . . . ." We address each in turn.

We begin with the issue of the proposed septic system for the property. On the completed application form

that it submitted to the commission, the applicant stated that there would be "[n]o modification to leach fields" currently on the property. At the public hearing, Szymanski reiterated that the applicant was proposing no change to the existing septic system design. At the public hearing, Purnell submitted into evidence a copy of the specifications for the existing septic system on the property. The record includes additional details as to that design in a letter that the applicant submitted to the wastewater management division at the Department of Environmental Protection (now the Department of Energy and Environmental Protection) as part of the 2008 permit process, which Purnell appended to her June 20, 2018 written submission to the commission. Moreover, the septic system is memorialized on the site plan submitted by the applicant.

With respect to the type and location of materials to be removed, stockpiled, or deposited on the property, the completed application states: "Placement of utility conduit, water mains, sanitary lines, pavement, modified riprap, driveway base per detailed plans previously proposed." In his February 14, 2018 letter to Hill, Szymanski also explained that "[t]he only changes proposed since the [2008 permit] is approximately [ten] cubic yards of fill on the east and west for emergency egress and the grass paver gathering areas." In addition, the specifics regarding those materials are depicted on the construction sequence sheets, the sedimentation and erosion control plan, the planting plan, and the detail sheets contained in the applicant's site plan.

The application form also asks applicants to "[d]escribe alternatives considered and why the proposal described herein was chosen . . . ." In its completed application, the applicant stated that it considered, as an alternative, "utilizing [the] existing site as it was," but noted that the existing site contained "structures and lawn within the wetlands." The applicant further explained that "[a] detailed mitigation plan was previously approved [as part of the 2008 permit] and is still proposed to remove the previous direct impacts to the wetlands as well as [to] improve the regulated area."

As to the issue of stormwater management, the applicant submitted a 209 page stormwater management report prepared for the property in connection with the 2008 permit dated September 7, 2010, as most recently revised to June 18, 2018. Both the experts retained by Purnell and the commission's consultants at Land-Tech reviewed that stormwater management report and commented thereon during the public hearing. The commission, as the arbiter of credibility, was entitled to credit that evidence in concluding that the application satisfied the regulatory requirements. See, e.g., *Unistar Properties, LLC* v. *Conservation & Inland Wetlands Commission*, supra, 293 Conn. 123 ("[i]t is well estab-

lished that credibility . . . determinations are solely within the province of the commission"); *Briggs* v. *State Employees Retirement Commission*, 210 Conn. 214, 217, 554 A.2d 292 (1989) (court "must defer . . . to the agency's right to believe or disbelieve the evidence presented by any witness . . . in whole or in part"); *Slootskin* v. *Commission on Human Rights & Opportunities*, 72 Conn. App. 452, 463, 806 A.2d 87 (court cannot substitute its judgment for that of agency as to weight of evidence on question of fact), cert. denied, 262 Conn. 910, 810 A.2d 275 (2002).

Last, with respect to the alleged omission of a soil data report, we note that § 8.05 of the regulations contains no such requirement for permit applications. Rather, § 8.06 of the regulations provides that the submission of a soil data report is required only "[a]t the discretion" of the commission or when the proposed activity involves a potential significant impact. In such instances, an applicant must provide a "[d]elineation of wetlands and watercourses on the site by a certified soil scientist and their depiction on the site plan. The soil scientist's report and sketch map or a statement by the soil scientist verifying the location of wetlands and watercourses shown on the site plan shall be submitted." Washington Inland Wetlands and Watercourses Regs., § 8.06 (d). It nonetheless remains that the applicant delineated the boundaries of the wetlands and watercourses on the property and the soil types on the site plan that was submitted to the commission. The applicant also submitted a map of soils on the property that was prepared for a prior owner and that previously was introduced during the 2008 permit process.

As we discussed in part I A of this opinion, the applicant incorporated the record of the 2008 permit, including soil data reports, into the present record. Purnell's discussion of that soil data during the public hearing in 2018 belies the plaintiffs' claim on appeal that "[Purnell] and her experts were foreclosed from reviewing this essential information." Furthermore, as commission members noted during the first night of the public hearing, it was "feasible" to incorporate reports previously submitted as part of the 2008 permit process "because the reports are on file here in a whole bunch of boxes." As Wadelton explained later that night, anyone interested in examining the record of the 2008 permit could "at your own time go down to the Land Use Office. You can pull the records. [The commission's administrative assistant] will help you find" the materials. That advice is consistent with § 9.07 of the regulations, which provides that "[a]ll applications shall be open for public inspection."

On our review of the record, we conclude that it contains substantial evidence to support a determination by the commission that the application satisfied the strictures of § 8 of the regulations. The court, therefore,

properly rejected the plaintiffs' claim.

## IV

The plaintiffs also claim that "it was error for the [Superior Court] to uphold this [permit] approval without a feasible and prudent alternative finding" by the commission. Such a finding, the plaintiffs argue, is required by both our General Statutes and the municipal regulations. They are mistaken.

The plaintiffs' claim involves a question of statutory interpretation, over which our review is plenary. See, e.g., *Hunter Ridge, LLC* v. *Planning & Zoning Commission*, 318 Conn. 431, 436, 122 A.3d 533 (2015). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *AvalonBay Communities, Inc.* v. *Zoning Commission*, 280 Conn. 405, 413, 908 A.2d 1033 (2006). Those maxims also govern the construction of municipal land use regulations. See *Moon* v. *Zoning Board of Appeals*, 291 Conn. 16, 20, 966 A.2d 722 (2009); *Graff* v. *Zoning Board of Appeals*, 277 Conn. 645, 652, 894 A.2d 285 (2006).

Our analysis begins with § 22a-42a (c) (1), which provides in relevant part: "The inland wetlands agency shall *not* hold a public hearing on [an] application [for a permit to conduct regulated activities] unless the inland wetlands agency determines that the proposed activity may have a significant impact on wetlands or watercourses, a petition signed by at least twenty-five persons who are eighteen years of age or older and who reside in the municipality in which the regulated activity is proposed, requesting a hearing is filed with the agency not later than fourteen days after the date of receipt of such application, or the agency finds that a public hearing regarding such application would be in the public interest. . . ."[40] (Emphasis added.) Pursuant to the plain language of that statute, a municipal inland wetlands agency is permitted to hold a public hearing on an application to conduct regulated activities in only three instances: (1) when the agency has made a threshold determination that the proposed activity may have a significant impact on wetlands or watercourses; (2) when the agency has determined that a public hearing on the application would be in the public interest; or (3) when the agency receives a timely petition for a

public hearing signed by at least twenty-five residents of the municipality in question.

In addition, with respect to any municipality "which does not regulate its wetlands and watercourses"; General Statutes § 22a-39 (i); the act authorizes the Commissioner of Energy and Environmental Protection to conduct a public hearing on applications for a permit to conduct regulated activities in that municipality.[41] General Statutes § 22a-39 (k). Because Washington has enacted inland wetlands and watercourses regulations in accordance with the act and has designated the commission as the agency charged with regulating activities in that municipality; see footnote 2 of this opinion; § 22a-39 (k) is inapplicable to the present case.

With that context in mind, we turn to General Statutes § 22a-41 (b) (1), which specifies precisely when a "feasible and prudent alternative" finding is required under Connecticut law. That statute provides in relevant part: "In the case of an application which received a public hearing pursuant to (A) subsection (k) of section 22a-39, or (B) a finding by the inland wetlands agency that the proposed activity may have a significant impact on wetlands or watercourses, a permit shall not be issued unless the commissioner finds on the basis of the record that a feasible and prudent alternative does not exist. . . ."[42] General Statutes § 22a-41 (b) (1). Section 22a-41 (b) (1) plainly provides that a feasible and prudent alternative finding is required in only two scenarios. The first is when the Commissioner of Energy and Environmental Protection has conducted a public hearing on an application pursuant to § 22a-39 (k). The second is when the municipal land use agency held a public hearing after making a threshold determination that "the proposed activity may have a significant impact on wetlands or watercourses . . . ." See General Statutes § 22a-42a (c) (1).

Neither scenario is implicated here. No hearing was held before the Commissioner of Energy and Environmental Protection. Moreover, the public hearing conducted by the commission over the course of five nights was not predicated on a finding that the activities proposed by the applicant may have a significant impact on wetlands or watercourses. Rather, that hearing was held in response to a petition signed by sixty-two residents of Washington. For that reason, the commission was not required to make a finding that no feasible and prudent alternative existed.

The plaintiffs' reliance on this court's decision in *Starble* v. *Inland Wetlands Commission*, 183 Conn. App. 280, 192 A.3d 428 (2018), is misplaced. Unlike the present case, *Starble* did not involve a public hearing held in response to a petition from local residents but, rather, one held following a determination by "[t]he commission . . . that the proposed plan could significantly impact the wetlands . . . ." Id., 283. *Starble* thus

is a case in which the second scenario outlined in § 22a-41 (b) (1) is implicated.

Also distinguishable is the decision of our Supreme Court in *Samperi* v. *Inland Wetlands Agency*, supra, 226 Conn. 579. To be sure, the court in *Samperi* held in unequivocal terms that, "[i]n order to issue a permit, the local inland wetlands agency must find that a feasible and prudent alternative does not exist." (Internal quotation marks omitted.) Id., 593. At the time of that decision, however, the operative statute, General Statutes (Rev. to 1991) § 22a-41 (b), provided in relevant part: "In the case of an [inland wetlands permit] application which received a public hearing, a permit shall not be issued unless the commissioner finds that a feasible and prudent alternative does not exist. . . ." Id., 581 n.1. Three years after *Samperi* was decided, the General Assembly amended that statute in Public Acts 1996, No. 96-157, § 2, thereby creating subdivisions (1) and (2) of § 22a-41 (b). Because *Samperi* antedated the enactment of the statutory requirements at issue in this case, it has no bearing on the proper construction of § 22a-41 (b) (1).

In the present case, the public hearing was held in response to a petition filed by Washington residents. Because neither of the two scenarios specified in § 22a-41 (b) (1) were implicated, the commission was not statutorily obligated to make a feasible and prudent alternative finding as a precursor to granting the permit application.

We also reject the plaintiffs' ancillary contention that the commission failed to give any consideration to feasible and prudent alternatives to the applicant's proposal in accordance with §§ 22a-19 (b) and 22a-41 (a) (2). To the contrary, the record reveals that, during the public hearing, the commission received documentary and testimonial evidence regarding feasible and prudent alternatives from Purnell, her experts from Towne Engineering, Inc., and Barnet. In addition, the applicant informed the commission, in its permit application, that it had considered "utilizing [the] existing site as it was [with] existing structures and lawn within the wetlands" as an alternative to the proposed development.

The record also indicates that commission members were cognizant of the fact that, although they were required to consider evidence of feasible and prudent alternatives, the commission was not required to make a feasible and prudent alternative finding unless it first determined that the proposal may have a significant impact on wetlands or watercourses. As Wadelton stated during the deliberations on the permit application, "[i]t is understood by the commission and noted here that to require the applicant to adopt the findings of feasible and prudent alternatives, the commission must first find that the planned feature has a reasonable probability of causing significant adverse impacts,

which would be reduced or eliminated by the alternative. In all discussion to date there has been no such finding."[43]

Furthermore, the record is replete with discussion of prior wetlands applications regarding the proposed development of the property, including nine modifications to the 2008 permit. Indeed, the applicant indicated, in the materials submitted in connection with the permit application, that it was seeking approval "based on the previously permitted project that has been thoroughly vetted." Both the applicant and Purnell provided ample evidence pertaining to those prior applications during the public hearing. As our Supreme Court has explained, "the review of multiple wetlands applications for a site can constitute the consideration by the agency of feasible and prudent alternatives." *Tarullo* v. *Inland Wetlands & Watercourses Commission*, 263 Conn. 572, 582, 821 A.2d 734 (2003). In light of the foregoing, we reject the plaintiffs' contention that the commission failed to give any consideration to the feasible and prudent alternatives raised by the parties.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In this opinion, we refer to Purnell and Giampietro individually by name and collectively as the plaintiffs.

[2] The commission is the inland wetlands agency of the town of Washington. See Washington Inland Wetlands and Watercourses Regs., § 1.02. Pursuant to General Statutes §§ 22a-36 through 22a-45, it is the entity charged with regulating the use of inland wetlands in that municipality.

[3] In their September 5, 2018 complaint, the plaintiffs also named Robert J. Klee, Commissioner of Energy and Environmental Protection, as a defendant. On October 4, 2018, the plaintiffs withdrew their complaint against Klee.

[4] In hearing appeals from decisions of an inland wetlands agency, the Superior Court acts as an appellate body. See General Statutes § 22a-43.

[5] "From 1907 until 1988, the property was the site of the Wykeham Rise School, a private college preparatory boarding school for girls. In 1988, the property was sold to Swiss Hospitality Institute, which operated a postsecondary residential hotel school between 1992 and 2003." *Peacocke* v. *Zoning Commission*, Superior Court, judicial district of Litchfield, Docket No. CV-11-6003862-S (February 7, 2013).

[6] The zoning commission's notice of approval of that settlement agreement was filed in the Washington land records at volume 231, pages 1131–32.

[7] General Statutes § 22a-38 (13) defines a regulated activity as "any operation within or use of a wetland or watercourse involving removal or deposition of material, or any obstruction, construction, alteration or pollution, of such wetlands or watercourses, but shall not include the specified activities in section 22a-40 . . . ."

In Washington, regulated activities also include "any discharging of storm water on the land, clear cutting, clearing (including clearing of understory), grubbing, filling, grading, paving, excavating, constructing, in wetlands, watercourses or upland review areas . . . . The [commission] may rule that any activity located in an upland review area or in any other non-wetland or non-watercourse area that is likely to impact or affect wetlands and watercourses is a regulated activity." Washington Inland Wetlands and Watercourses Regs., § 2.41.

[8] General Statutes § 22a-38 (15) defines wetlands in relevant part as "land, including submerged land . . . which consists of any of the soil types designated as poorly drained, very poorly drained, alluvial, and floodplain by the National Cooperative Soils Survey . . . ."

The record indicates that "[t]hree areas of wooded wetlands exist in the northwest-western portion of the [property] and a fourth wooded wetland occurs in the southeast corner . . . ."

[9] General Statutes § 22a-38 (16) defines watercourses in relevant part as "rivers, streams, brooks, waterways, lakes, ponds, marshes, swamps, bogs and all other bodies of water, natural or artificial, vernal or intermittent, public or private, which are contained within, flow through or border upon this state or any portion thereof . . . ."

The watercourse at issue here is Kirby Brook, a cold water stream that runs along the northern border of the property.

[10] Upland review areas are "[t]he buffer or setback areas around wetlands and watercourses . . . ." R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (4th Ed. 2015) § 11:5, p. 389. In Washington, the upland review area is defined in relevant part as "land within [100] feet, measured horizontally, of the boundary of any wetlands or watercourse." Washington Inland Wetlands and Watercourses Regs., § 2.52.

[11] The conditions attached to the 2008 permit to conduct regulated activities on the property provide in relevant part:

"1. A cash performance bond of $50,000 shall be submitted by the applicant prior to the onset of demolition [and] construction, to be held by the Town of Washington throughout the construction and subsequent monitoring periods. . . .

"2. Land-Tech Consultants . . . shall, on behalf of the [c]ommission, monitor job site conditions for any unanticipated erosion and sedimentation risks and to confirm compliance with application details and the use best management practices. . . .

"3. The site shall be monitored according to schedule for two (2) full years after the end of construction, and until the disturbed areas of the site are fully stabilized, whichever is later. The site shall not be deemed to be fully stabilized unless the [c]ommission makes a specific finding to that effect. Long term maintenance of the storm water management system shall comply with the maintenance schedule provided by the applicants . . . . A log of maintenance activities shall be submitted annually to the Land Use Office . . . . All wetland mitigation plantings, buffer plantings, and storm water pond plantings shall be monitored for [three] growing seasons. Dead plants are to be replaced by the applicant as needed during the monitoring period.

"4. The applicants shall conduct water testing and shall submit the results thereof to the Land Use Office . . . .

"5. Weekly reports by the erosion control professional . . . shall be submitted to the Land Use Office throughout all construction phases. A rain gauge shall be installed on site and rainfall amounts recorded in the weekly Erosion Control Reports.

"6. At the time of the preconstruction meeting, construction managers shall deliver detailed and specific construction sequences to the [inland wetlands enforcement officer] and the [c]ommission's consultant. . . .

"7. Any proposed change in the approved plans and/or the supporting documents must be reviewed by the [inland wetlands enforcement officer] prior to implementation. The [inland wetlands enforcement officer] may authorize minor changes or reductions in the scope of regulated activities, provided that any such changes shall be reported to the [c]ommission immediately, and further provided that the [c]ommission may require a permit modification for such changes if it finds that they may have a previously unanticipated impact on wetlands or watercourses. Any substantial changes, such as changes in location, enlargements, modifications to septic due to [Department of Energy and Environmental Protection] review, or changes that may in any way impact wetlands and/or watercourses must be approved by the [c]ommission prior to implementation.

"8. During the demolition and construction unstabilized or unvegetated site disturbance shall be limited to [three] acres at any one time."

[12] Among the modifications approved by the commission were a reduction in the total lot coverage on the property, a reduction in the total area of the proposed buildings, and the removal of all proposed development in a portion of the property burdened by a conservation easement.

[13] Pursuant to § 12.01 of the Washington Inland Wetlands and Watercourses Regulations, the commission's authorized agent may grant a permit application "as filed or grant it upon other terms, conditions, limitations, or modifications of the regulated activity . . . ." Moreover, the conditions attached to the 2008 permit expressly provide that the inland wetlands enforcement officer "may authorize minor changes or reductions in the scope of regulated activities . . . ." Footnote 11 of this opinion.

[14] For example, with respect to the removal, deposit, or stockpiling of materials, the applicant stated: "Placement of utility conduit, water mains,

sanitary lines, pavement, modified riprap, driveway base per detailed plans previously proposed." Regarding the "[d]escription, work sequence, and duration of activities," the applicant stated: "Please see associated [c]onstruction [s]equence sheets previously approved which are to still be utilized." The application also noted that "[a] detailed mitigation plan was previously approved and is still proposed to remove the previous direct impacts to the wetlands as well as improve the regulated area."

[15] The application included a letter from Erika Klauer, the manager of the applicant company, which states in relevant part: "Please allow [Szymanski] to submit and discuss any issues related to the [application] as I authorize him to work on our behalf with you."

[16] Szymanski explained that, as a part of the special permit process before the zoning commission, the applicant had a building code and safety review conducted, which found that "the main building . . . required the addition of three concrete landings. . . . [W]e need a minimum of fifty foot grass paver, maintained as grass, area that goes to a 500 square foot emergency egress gathering area that's relatively level, [and] there's some minor regrading associated with that. . . . [T]he only activity . . . within the upland review area is approximately half of the concrete pad in the northeast corner, that's located about ninety-five to a hundred feet from the wetlands. It's lateral to the wetlands, so it's not . . . upgradient of it. And [the] egress gathering area [is] located [approximately] thirty feet lateral to the wetland. . . . [T]he closest wetland downgradient is approximately a hundred feet. So, again, [grass paver pedestrian area] would be maintained [in the event that] there's a fire, we need a place where people come out of the building, gather and then disperse. . . .

"As part of the building code review for the fitness spa building [is] the necessity for a five foot by twenty foot pull off at the front of the spa house building. So, what we've done is, we've shifted that building five feet [farther] away from the wetlands. You may recall that building was already outside of the upland review area, but we've moved it even [farther] away. And that necessitated a concrete landing on the left side of the building that's approximately a hundred and forty feet away from the wetlands. And again, that's just a grass area to the driveway [because] the driveway can act as the gathering area. And then in the pool house area, there's three concrete pads added [that] are about 400 feet away from the wetlands. . . . [S]o, since we were last before you for revisions [to the 2008 permit], I . . . believe it was the middle of last year, [those] are the only modifications . . . to the plan."

[17] As our Supreme Court has observed, "[a]lthough site visits are not required by the act . . . they may be necessary for commissioners thoroughly to evaluate property that is the subject of an application." (Footnote omitted.) *Grimes* v. *Conservation Commission*, 243 Conn. 266, 277, 703 A.2d 101 (1997). In the present case, the commission's site visit report states in relevant part: "Szymanski led [a] review of [the] site plan including indication of proposed new buildings, limit of disturbance, rain gardens and handling of rain water discharge."

[18] As but one example, the record includes an October 5, 2011 report to the commission from Land-Tech Consultants, Inc., which had been retained by the commission to review all changes in the new application. The report was prepared, in part, in response to "[a] letter from [Purnell] to the [commission] with attachments dated September 28, 2011." In that report, Land-Tech addressed Purnell's comments on the 2008 permit regarding (1) the "[e]xpanded [p]arking area"; (2) "[i]mpervious [c]over"; (3) "[p]orous [p]avement"; (4) "[r]ain [g]ardens"; (5) "[w]et [p]onds"; (6) "[c]onstruction [s]equence [and] [p]roject [p]hasing"; (7) "[p]ollution [i]ssues"; (8) "[f]easible and [p]rudent [a]lternatives"; and (9) "[m]onitoring and [e]nforcement."

[19] General Statutes § 22a-42a (c) (1) provides in relevant part: "The inland wetlands agency shall not hold a public hearing on [an] application [for a permit to conduct regulated activities] unless the inland wetlands agency determines that the proposed activity may have a significant impact on wetlands or watercourses, a petition signed by at least twenty-five persons who are eighteen years of age or older and who reside in the municipality in which the regulated activity is proposed, requesting a hearing is filed with the agency not later than fourteen days after the date of receipt of such application, or the agency finds that a public hearing regarding such application would be in the public interest. . . ."

In the present case, the public hearing before the commission was not premised on its determination that the activities proposed by the applicant may have a significant impact on wetlands or watercourses or that a public

hearing would be in the public interest. Rather, the hearing was held following the commission's receipt of the petition from local residents.

[20] Matthew D. Maynard and Joseph H. Boucher of Towne Engineering, Inc., and Steven D. Trinkaus of Trinkaus Engineering, LLC, appeared on behalf of Purnell.

[21] Allan is a professional wetlands scientist and a certified soil scientist.

[22] The report states in relevant part that the new application contained the following revisions:

"[1.] Addition of three concrete landings adjacent to the Main Building at emergency exit points.

"[2.] Addition of a two grass paver emergency gathering areas and walkways from the Main Building on its east and west sides.

"[3.] Addition of two yard drains and associated piping south of the Main Building in place of previously proposed graded drainage swales.

"[4.] Addition of one concrete landing adjacent to the Fitness/Activity Building at emergency exit point with one grass paver walkway.

"[5.] Addition of three concrete landings adjacent to the Pool House at emergency exit points with two proposed grass paver walkways.

"[6.] Addition of a [five foot] by [twenty foot] paved pull-off east of the Fitness/Activity Building.

"[7.] Relocation of the Fitness/Activity Building [five] feet closer to the driveway/pull-off to the east."

[23] The public hearing briefly resumed on May 30, 2018, but no new evidence was presented.

[24] Those revised plans contain twenty-six sheets, seventeen of which were revised to June 18, 2018. The record also contains a letter from Szymanski to the commission dated June 12, 2018, which contains detailed responses to the recommendations contained in the Land-Tech report.

[25] In that letter, Oskandy stated in relevant part: "As requested, we have performed the Hydraulic Grade Analysis and made some adjustments to the storm drainage accordingly. The changes affect [certain] structures . . . mostly regarding invert elevations and pipe configuration. Accordingly, some minor adjustments have been made to the outlet control and protection for the ponds."

[26] In response to concerns raised by Purnell, Wadelton clarified for the record that Land-Tech "is merely going to respond to information that your experts provided."

[27] In its letter to the commission, Land-Tech noted that certain inconsistencies between the applicant's plan and its stormwater management report could be resolved through the submission of a revised plan with updated calculations. In particular, Land-Tech noted that "[t]here seems to be a discrepancy between the routed discharge rates for Pond #1 and #2 for the [twenty-five] year storm and the rates used to calculate the outlet protection at these discharge points. If the application is approved, the applicant should revise the calculation as necessary and submit revised calculations/plans as a condition of approval." Land-Tech also suggested that, "[i]f the application is approved, the applicant [should] revise the outlet control details to be consistent with the [stormwater management] report calculation on the final plan set." In response to the concern of Towne Engineering, Inc., that "[t]his project only has a conceptual water supply approval," Land-Tech noted that "[t]his comment can be addressed by requiring a final water supply approval as a condition of approval. Any material changes to the proposed water supply will require [resubmission] of plans and an application to the [c]ommission."

[28] The conditions attached to the commission's approval state:

"1. A cash performance bond of $75,000 shall be submitted by the applicant prior to the onset of demolition and construction to be held by the Town of Washington throughout construction and subsequent monitoring periods. These monies may be used by the Town to secure the site in the event that malperformance or neglect by the applicant or [its] agents creates a risk of adverse impact on inland wetlands or watercourses. If the Town uses any bond funds pursuant to this condition, the applicant must, within [fifteen] calendar days, replenish or restore the bond to the full $75,000 amount before construction may continue.

"2. A qualified professional in erosion and sediment control and stormwater management shall on behalf of the [c]ommission, monitor job site conditions for any unanticipated erosion and sedimentation risks and to confirm compliance with application details and the use of best management practices. The applicant shall be responsible for all of this qualified professional's fees for these services and shall, no later than the date of commencement of construction, submit to the [c]ommission a cash bond, which shall be

held by the Town and which must be maintained in the amount of $5,000 throughout all phases of construction and monitoring. The Town shall pay the professional's fees from the bond and the applicant shall replenish the bond to the full $5,000 amount within [fifteen] calendar days. The professional will issue a report to the Land Use Office, with a copy to the applicant after each site inspection, generally according to the following guidelines: Consultant's Inspection Schedule: twice per month during general construction phases and periods, seasonally during post construction and throughout the monitoring period, and at any time at the request of the Land Use Enforcement Officer or because of malperformance, neglect, or serious weather situations. Also, the Wetlands Enforcement Officer shall inspect the site once per week during the construction phases.

"3. The site shall be monitored according to schedule for [two] full years after the end of construction, and until the disturbed areas of the site are fully stabilized, whichever is later. The site shall not be deemed to be fully stabilized unless the [c]ommission makes a specific finding to that effect. Long term maintenance of the stormwater management system shall comply with the maintenance schedule as described on the site development plans. A log of maintenance activities shall be submitted annually to the Land Use Office in December. All wetland mitigation plantings, buffer plantings, and stormwater pond plantings shall be monitored for [three] growing seasons. Dead plants are to be replaced by the applicant as needed during the monitoring period.

"4. Bi weekly (every other week) reports by the erosion control professional noted in the construction sequences shall be submitted to the Land Use Office throughout all construction phases. A rain gauge shall be installed on site and rainfall amounts recorded in the bi weekly erosion control reports.

"5. At the time of the preconstruction meeting, construction managers shall deliver detailed and specific construction sequences to the enforcement officer and to the [c]ommission's consultant. These sequences should adhere to the approved sequences in the file and be augmented by more specific description and timing.

"6. Any proposed change in the approved plans and/or supporting documents must be reviewed by the enforcement officer prior to implementation. The enforcement officer may authorize minor changes or reductions in the scope of regulated activities provided that any such changes shall be reported to the [c]ommission immediately and further provided that the [c]ommission may require a permit modification for such changes if it finds that they may have a previously unanticipated impact on wetlands and watercourses. Any substantial changes such as changes in location, enlargements, modifications to septic due to [Department of Energy and Environmental Protection] review, changes in the sequence of construction, or changes that may in any way impact wetlands and/or watercourses must be approved by the [c]ommission prior to implementation.

"7. During the demolition and construction, unstabilized or unvegetated site disturbance shall be limited to [five] acres at any one time.

"8. Regarding the routed discharge rates for Pond #1 and #2 for the [twenty-five] year storm and the rates used to calculate the outlet protection at these discharge points, the applicant shall revise the calculation as necessary and submit the revised calculations and plans to the Land Use Office and [c]ommission's professional consultant for review prior to the commencement of demolition and construction.

"9. The outlet control details shall be revised to be consistent with the stormwater management report calculations provided on the final plan set.

"10. The applicant shall prepare a minimum of three full plan sets incorporating all revisions and conditions of approval and submit them to the Land Use Office and to [Land-Tech] for review prior to the commencement of demolition and construction."

[29] It is undisputed that Purnell possessed standing as an intervening party and that Giampietro possessed standing as an owner of abutting property. See General Statutes § 22a-43 (a).

[30] On the second night of deliberations, the five voting members of the commission each made statements on the merits of the application prior to voting on the motion to approve. All five commissioners opined that the revisions to the development plan proposed by the applicant would not have an adverse impact on the property's wetlands and watercourses. Under established precedent, those individual statements nonetheless cannot constitute the collective statement of the commission. See *Protect Hamden/ North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, 220 Conn. 527, 546 n.15, 600 A.2d 757 (1991) (it is not "appropriate for a reviewing court to attempt to glean such a formal, collective statement from the minutes of the discussion by . . . members prior to the

commission's vote"); *Welch* v. *Zoning Board of Appeals*, 158 Conn. 208, 214, 257 A.2d 795 (1969) ("individual views" of board members "are not available to show the reason for, or the ground of, the board's decision"); *Verrillo* v. *Zoning Board of Appeals*, 155 Conn. App. 657, 674, 111 A.3d 473 (2015) (individual reasons stated by land use agency members during deliberations cannot constitute collective statement of agency).

[31] In its letter, Land-Tech stated that it previously had reviewed test hole data supplied by the applicant for the "proposed rain garden locations" and "the two stormwater ponds . . . ."

[32] In his April 6, 2018 letter to the commission, Szymanski stated in relevant part: "Land-Tech Consultants . . . reviewed the applicant's test pit profiles and the permeability testing results. . . . Test hole data for the two stormwater ponds indicate seasonal high groundwater conditions. The soil data indicates seasonally fluctuating groundwater with a maximum height of [two to three] feet below existing grade in the vicinity of the basins. The stormwater ponds have been designed to maintain a wet bottom, with ponded water to a depth of the lowest basin outlets. The basins are designed such that stormwater storage volume is calculated above the lowest basin outlets and there is no credit for storage below these invert elevations. Any groundwater seeping into the ponds will be continuously drained via the lowest pond outlets with little impact on pond elevations or pond storage volume. Based on [a] review of the basin sizing calculations, the presence of groundwater will not impact the operation of the basins and will not result in the loss of any basin capacity. Soil permeability data has been provided by the applicant for six soil tests conducted within proposed rain garden locations. Undisturbed soil samples were taken at [thirty-six] inch depths for testing. The [thirty-six] inch depth corresponds with the proposed depth of the undisturbed subgrade soils below pervious material used to construct the rain gardens. The permeability tests indicate that the subgrade soils have adequate infiltration capacity. Permeability rates range from approximately [one] foot per day to [eight feet] per day. The applicant's soil scientist has also stated that seasonal high groundwater conditions were not encountered at the [thirty-six] inch testing depth."

[33] At the public hearing, Szymanski responded to Purnell's comments on the deep test pit data, stating, in relevant part: "[Those] test pits were performed at the request of Land-Tech. They agreed with the findings of the test pits. . . . So the test pits were performed at the request of [the commission's] third-party engineer. They reviewed it. They . . . felt that [it] satisfactorily addressed their concerns."

[34] Those three conditions state in full:

"8. Regarding the routed discharge rates for Pond #1 and #2 for the [twenty-five] year storm and the rates used to calculate the outlet protection at these discharge points, the applicant shall revise the calculation as necessary and submit the revised calculations and plans to the Land Use Office and [c]ommission's professional consultant for review prior to the commencement of demolition and construction.

"9. The outlet control details shall be revised to be consistent with the stormwater management report calculations provided on the final plan set.

"10. The applicant shall prepare a minimum of three full plan sets incorporating all revisions and conditions of approval and submit them to the Land Use Office and to [Land-Tech] for review prior to the commencement of demolition and construction."

[35] We recognize that both the commission and its legal counsel at times used the term "significant" rather than "material" to describe the metric of any change of conditions or considerations. In the context of the impotent to reverse rule, that is a distinction without a difference. See Black's Law Dictionary (9th Ed. 2009) p. 1066 (defining "material" in relevant part as "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant"); see also *United States ex rel. Moore & Co., P.A.* v. *Majestic Blue Fisheries, LLC*, 812 F.3d 294, 306 (3d Cir. 2016) (noting that " 'material' is defined as 'significant, influential, or relevant' "); *Cuyahoga Metropolitan Housing Authority* v. *United States*, 65 Fed. Cl. 534, 552 n.20 (2005) (noting that "various courts have defined 'material' as meaning 'significant' ").

[36] During the commission's deliberations, Wadelton reminded his colleagues that, although "[t]here definitely have [been] some . . . considerable changes to the plans . . . we have to remember that each time those changes were made they came before the commission, the commission considered those [changes] and approved it . . . ."

[37] We reiterate that, after conducting an initial review of the application

at its regular meeting on February 14, 2018, and a site inspection of the property on March 27, 2018, the commission held a public hearing on the application over the course of five nights between April 3 and July 11, 2018. The commission then deliberated the merits of the application for two nights on July 31 and August 14, 2018. As the voluminous return of record before us indicates, the commission's review of the present application was exhaustive.

[38] In addition, § 8.06 of the regulations lists several additional items that may be required "[a]t the discretion of the [commission] or when the proposed activity involves a potential significant impact . . . ."

[39] Specifically, that memorandum noted that "[s]pecifics on amount, type, and location of materials to be removed, stockpiled, or deposited not provided," "[c]onstruction sequence not provided," "[i]nfo such as when the work will be done, duration of work, equipment to be used, etc. not provided," "the pertinent section of the [United States Geological Survey] map" was not provided, and the "[e]rosion and [s]edimentation [c]ontrol [p]lan was not included."

[40] The regulations contain an identical provision. See Washington Inland Wetlands and Watercourses Regs., § 10.03.

[41] Although not germane to the present case, the act also authorizes the Commissioner of Energy and Environmental Protection to "[g]rant, deny, limit or modify . . . an application for a license or permit for any proposed regulated activity conducted by any department, agency or instrumentality of the state, except any local or regional board of education . . . ." General Statutes § 22a-39 (h).

[42] The regulations similarly provide that, "[i]n the case of an application, which received a public hearing pursuant to a finding by the [commission] that the proposed activity may have a significant impact on wetlands or watercourses, a permit shall not be issued unless the [commission] finds on the basis of the record that a feasible and prudent alternative does not exist." Washington Inland Wetlands and Watercourses Regs., § 11.03.

[43] Wadelton's remarks also demonstrate that the commission gave due consideration to the alternatives proposed by Purnell and her experts. He stated in relevant part that "much of what was presented as feasible and prudent alternatives were actually nothing more than valid alternative approaches to solving particular engineering problems which one would expect from two different engineers . . . . In several cases, the applicant agreed to the comments . . . and agreed to make the necessary changes to the plan."